1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11    JUSTON-MICHAEL TYLER POTTS,        )    No. C 09-5849 LHK (PR)
                                         )
12                    Petitioner,        )
                                         )    ORDER DENYING PETITION FOR WRIT
13        v.                             )    OF HABEAS CORPUS; DENYING
                                         )    CERTIFICATE OF APPEALABILITY;
14    MIKE McDONALD, Warden,             )    REFUNDING SECOND FILING FEE; AND
                                         )    INSTRUCTIONS TO CLERK
15                    Respondent.        )
      _____)
16

17        Petitioner, who is also known as "Knyva," is a state prisoner proceeding *pro se*.  He filed

18    a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He paid the filing fee.[1]

19        The Court ordered Respondent to show cause why the petition should not be granted.

20    Respondent has filed an answer addressing the merits of the petition.[2]  Petitioner has filed a

21    traverse.  Having reviewed the briefs and the underlying record, the Court concludes that

22

23        [1] The record shows that Petitioner has paid the $5.00 filing fee twice.  See Receipt

24    # 34611041226 (Docket no. 6), Receipt # 34611041766 (Docket no. 10).  Therefore, he is
      entitled to a refund for the second $5.00 filing fee paid in this action, as directed below.

25

26        [2] Petitioner named James Walker, former warden of California State Prison - Sacramento
      in Folsom, California, as the Respondent in this action.  Mike McDonald, the current warden of

27    High Desert State Prison in Susanville, California -- where Petitioner is currently incarcerated --
      has been substituted as Respondent in place of Petitioner's prior custodian pursuant to Rule 25(d)

28    of the Federal Rules of Civil Procedure.

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd

1  Petitioner is not entitled to relief based on the claim presented and denies the petition.

2  <center>**PROCEDURAL HISTORY**</center>

3          The Contra Costa County district attorney filed an information charging Petitioner with

4  first degree murder of Shani Holloway.  The district attorney also alleged that Petitioner

5  personally discharged a firearm causing death.  Petitioner pled not guilty and not guilty by

6  reason of insanity.

7          On December 8, 2006, Petitioner's nonjury trial began.  CT 382.  On December 18, 2006,

8  the trial court found Petitioner guilty of first degree murder.  The trial court also found all three

9  of the firearm enhancements to be true, and that Petitioner was sane at the time of the crime.  CT

10 405.

11         On January 12, 2007, the trial court sentenced Petitioner to a term of twenty-five years to

12 life in state prison for the first degree murder.  The court also imposed a consecutive term of

13 twenty-five years to life for the enhancement of personally discharging a firearm proximately

14 causing death.  Petitioner was also sentenced to ten-and twenty-year terms for the other two

15 firearm enhancements, which were stayed.  Thus, Petitioner's total term was fifty years to life.

16 CT 431.

17         Petitioner timely appealed.  On April 22, 2008, the California Court of Appeal affirmed

18 the conviction.  On July 9, 2008, the California Supreme Court denied review.

19         Thereafter, Petitioner filed a petition for a writ of habeas corpus in the state superior

20 court, raising the same claim as in the present federal petition.  On March 4, 2009, the state

21 superior court denied the petition stating that it had "no jurisdiction to grant the relief requested"

22 because it believed the "Court of Appeal is the correct forum . . . ."  (Resp. Exh. I, Attach.)

23         On June 16, 2009, Petitioner filed a petition for a writ of habeas corpus in the state

24 appellate court.  On June 18, 2009, that court summarily denied his petition.  (*Id.*)

25         On June 25, 2009, Petitioner filed a petition for a writ of habeas corpus in the state

26 supreme court.  On November 10, 2009, that court also issued a summary denial of his petition.

27 (Resp. Ex. J.)

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd          2

1    Petitioner commenced this federal action on December 15, 2009.

2                        **BACKGROUND**[3]

3           Justin Tensley testified that he and Holloway first met defendant, who
     was well known in the underground rap community, four or five months
4    before Holloway was killed.  The three entered into a business relationship
     which "started off pretty intact on [a] business level.  Then it started getting
5    kind of rocky."  Holloway and Tensley met with defendant and a man named
     "Chief," whom Tensley described as possibly defendant's manager,
6    approximately one month before Holloway was killed.  The meeting "started
     off pretty intact, you know, business ethics [and] all that.  But once we started
7    getting around to the paperwork it was like [defendant and Chief] were just
     trying . . . to get us to promote some songs that were previously on somebody
8    else's album.  So we were . . . trying to tell these guys if you want this song on
     this CD you have to get this gentleman to, you know, give you permission and
9    when they're saying they gave us permission, his word, verbal agreement."
     Tensley did not accept defendant's representation that he had permission to
10   use a particular song.  There were constant disagreements regarding
     defendant's desire to use other people's music without permission.  "Any time
11   we tried to discuss promoting music . . . that always came up."  Nevertheless,
     Tensley also testified that relations with defendant were friendly.

12
            On the afternoon of June 6, 2004, Holloway and Tensley had plans to
13   meet defendant at their home in Hercules, but defendant did not appear.  Later
     that day, as Tensley and Holloway were driving to a friend's house to watch a
14   basketball game, they saw defendant.  Holloway "flagged him down, asked
     him where he was going.  And he said he was going to El Pueblo, and
15   that . . . he needed a ride."  Holloway suggested that defendant join them at
     their friend's house but Tensley said, "that's not our house, and we don't know
16   if they'll let him come up."  The three drove to the friend's house, and when
     they arrived defendant remained in the car while Tensley and Holloway asked
17   if defendant could join them.  The friend declined to invite defendant in, and
     Holloway and Tensley returned to the car and asked defendant if they could
18   drive him anywhere.

19          Defendant asked to be taken to an apartment complex called
     Peppermill in Pittsburg.  Once there, defendant directed Tensley where to
20   park and the three began discussing business.  Tensley and Holloway "were
     talking about being on the radio, making his music for the radio."  Defendant
21   "wasn't too happy about that.  He said that he didn't want to be on the radio."
     Tensley and Holloway were not "happy to hear that. . . . [T]hat doesn't make
22   no sense.  If you want to make music and make a lot of money, how are you
     going to do it and not be on the radio?"  They told defendant they did not
23   understand his concern, but defendant maintained that he did not want his
     music presented in a manner associated with mainstream music.  Defendant
24   got out of the car, saying, "'Fuck the radio.  The radio is not shit.  I'm not
     trying to do that, and I'll be right back.'"  When he got out of the car, he "[h]ad
25   a phone on his lap.  The phone hit the ground, shattered everywhere.  He

26
     _____
27      [3]  The facts of this case are taken from the California Court of Appeal opinion in *People
     v. Potts*, No. A116692, 2008 WL 1801578 (Cal. App. 1 Dist. Apr. 22, 2008).  (Resp. Ex. F
28   ("Op.")).

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd          3

1
2
3
4
5
6

picked up all the phone piece[s].  He didn't even put the phone back together.
Put it in the pocket, and he went over to" an SUV that was parked nearby.
Tensley and Holloway remained in the car discussing the issue of radio
promotion.  As they talked, the SUV pulled closer to them.  Defendant was
walking next to the SUV and speaking to the driver.  Then "he walks up on
the passenger side [of Tensley's car], and he didn't say a word or anything like
that and extended his arm, out and that was it -- pow.  Pow.  [¶] . . . [¶]  After
he shot her I seen him.  And she falls over to her side.  And then I'm looking
at him while he has his arm extended out, and after we looked at each other
[in] the eyes -- he darts off.  He jumps in the SUV.  They pull off."  Tensley
took Holloway to the hospital, where she died that evening.

7
8
9
10
11
12

Michael Russell testified that on the day Holloway was shot, he was in
an SUV being driven by his girlfriend, Harun.  They saw defendant at the
apartment complex "in the middle of [the] street flagging us down."  Russell
and Harun told defendant "to get in.  We were having a barbecue.  And he told
her that somebody was talkin' about his mama.  And she said did he want me
to take care of it.  He said, 'no.'  We asked him did he have some money for
some meat.  He said, 'Hold on a minute. I'll be right back.'"  He then walked to
another car, then "walked back to the car and said, 'let's go.'"  Defendant was
"normal" when he returned to the SUV.  He got in the back seat and "told us
to drive off.  Then he said he had to slap that bitch."  Harun asked what he
meant, and defendant replied, "I had to pop that bitch."  Russell began
screaming, "Get him out of the car," and they dropped off defendant.

13
14
(Op. at 1-3.)

15
**DISCUSSION**

16
A.    Standard of Review

17
18
19
20
21
22
23
24
25
26
27
28

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a state court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court

may not grant a petition challenging a state conviction or sentence on the basis of a claim that

was reviewed on the merits in state court unless the state court's adjudication of the claim

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  The first prong

applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v.*

*Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd        4

1   factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

2           "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

3   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

4   the state court decides a case differently than [the] Court has on a set of materially

5   indistinguishable facts." *Terry*, 529 U.S. at 412-13.  A state court decision is an "unreasonable

6   application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the

7   state court correctly identifies the governing legal principle from the Supreme Court's decisions

8   but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

9   federal court on habeas review may not issue the writ "simply because that court concludes in its

10   independent judgment that the relevant state-court decision applied clearly established federal

11   law erroneously or incorrectly." *Id.* at 411.

12           Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination

13   will not be overturned on factual grounds unless objectively unreasonable in light of the

14   evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.  The Court must

15   presume correct any determination of a factual issue made by a state court unless Petitioner

16   rebuts the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. §

17   2254(e)(1).

18           In determining whether the state court's decision is contrary to, or involved an

19   unreasonable application of, clearly established federal law, a federal court looks to the decision

20   of the highest state court to address the merits of Petitioner's claim in a reasoned decision.

21   *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

22           The last reasoned opinion of the state courts discussing Petitioner's claim was that of the

23   state superior court which found that it did not have jurisdiction to consider the matter because,

24   as mentioned above, it believed that the state appellate court was the correct forum.  (Resp. Exh.

25   I, Attach.)  Although a federal court will normally "look through" a silent denial to the last

26   reasoned decision of the state courts, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), the

27   presumption that subsequent unexplained decisions rest on the same basis as the explained

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd          5

1  decision is rebuttable. *Id.* at 804-05.  Because the subsequent decisions of the state appellate and

2  supreme courts could not reasonably have been based on the theory that Petitioner pursued his

3  remedy in the wrong forum, the Court will assume that the presumption that the unexplained

4  decisions reflect the same reasoning as the explained decision has been rebutted, and that the

5  state appellate and supreme courts denied the respective petitions on the merits.

6  B.     Petitioner's Claim

7         1.     Factual Background

8         Petitioner raises the following claim in his federal habeas petition: that his appellate

9  counsel, who argued on direct appeal that the evidence did not support the verdict of first degree

10 murder, rendered ineffective assistance by failing to raise an issue pertaining to the trial court's

11 finding that Petitioner had not sustained his burden with respect to the insanity defense.

12        As explained above, Petitioner pleaded not guilty and not guilty by reason of insanity.

13 The record shows that Petitioner agreed to allow the trial court to hear evidence on the sanity

14 issue before ruling on the guilt phase issues.  RT 468-469.  There is no other state court opinion

15 which summarizes the facts underlying Petitioner's ineffective assistance of counsel claim.

16 Respondent has summarized the background facts relating to the ineffective assistance of claim

17 in his memorandum of points and authorities in support of the answer.  There is nothing in the

18 record that indicates that Petitioner disputes the underlying course of events.  The Court has

19 reviewed the facts and agrees with Respondent's interpretation.  Accordingly, the Court includes

20 here Respondent's summary of the facts relevant to Petitioner's ineffective assistance of counsel

21 claim as well as the facts with respect to the sanity issue:

22              Dr. Martin Blinder, a psychiatrist, who was appointed by the court to
            examine petitioner in connection with the issue of sanity, met with petitioner
23          for less than an hour on April 2, 2006.  RT 492, 494.  Based on his interview,
            his review of various records, including records showing that petitioner had
24          harmed himself while in custody, Dr. Blinder concluded that petitioner
            suffered from probable drug induced paranoid psychosis, with mild residual
25          cerebral organicity secondary to his years of polysubstance abuse.  The
            substances that were abused were primarily alcohol, marijuana, ecstasy and
26          cocaine.  RT 488.

27              Dr. Blinder stated that paranoid people misjudge situations and see a
            neutral situation as threatening and hostile.  RT 488-89.  He based his opinion

28

on the fact that jail records showed that petitioner was psychotic while he was in custody, that the crime had a paranoid component to it, that petitioner had used marijuana, and marijuana can make a person paranoid. RT 498-500.

Dr. Blinder thought that petitioner misperceived the situation that resulted in the shooting and that as a result of the misperception petitioner might not have appreciate the wrongfulness of his acts. RT 489. He thought it possible that petitioner's condition met the threshold for legal insanity, but admitted that he could not prove that it reached or exceeded that level. RT 490.

Dr. Blinder had not reviewed the police reports of the incident, and had not read petitioner's lyrics. RT 496, 506. He did not know about the disagreement between Holloway and petitioner as to the way petitioner's music would be marketed. RT 503.

Paul Good, a forensic psychologist who was appointed to assess petitioner's condition[,] RT 525-527, stated that petitioner reported that on the day before the murder, a voice inside him had asked if he wanted to feel what it was like to be shot in the head. RT 529. Petitioner told Dr. Good that he was angry at and disappointed with the victim, but that he was unable to remember much about the shooting. RT 528-531.

Dr. Good noted that the jail records did not show that petitioner had any signs of mental disorder until October 2, 2004. RT 531. Petitioner gave him a history of having used four to six marijuana blunts a day since adolescence. Petitioner also told him he was drinking eight ounces of liquor every few days, as well as a few beers, and that he was using ecstasy on a regular basis as well as cocaine. RT 531.

Petitioner said that his substance abuse and criminal conduct occurred in the wake of his mother's death when he was 12. RT 531. Petitioner claimed to have had auditory hallucinations at times, but Dr. Good did not see evidence of current hallucinations. RT 534. He believed petitioner's mental faculties were within normal limits. RT 534.

A test that measured malingering showed that petitioner over-reported symptoms on four of five different scales. RT 535. Dr. Good thought petitioner was sane when he committed the murder. RT 536. The basis for his opinion was that petitioner's behavior was organized and purposeful. The fact that petitioner decided to leave the scene showed that he understood he had done something wrong. RT 536-37. Petitioner also said right afterwards, "I popped her". This showed that he knew he had shot the victim. RT 537. According to Dr. Good, the fact that petitioner attempted to flee at the police station and that when the police called his cell phone, he said that no one was there by the name the police asked for, showed that he understood he had done something wrong. RT 538-540.

The court, sitting as the trier of fact, found that petitioner was sane. RT 602.

(Answer at 5-6.)

2.    Applicable Federal Law

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See id.* at 697. Where the defendant is challenging his conviction, the appropriate question is "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir.), *amended*, 311 F.3d 928 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695); *see, e.g.*, *Plascencia v. Alameida*, 457 F.3d 1190, 1201 (9th Cir. 2006) (ineffective assistance of counsel claim not established because "any prejudicial effect was at best minute" from counsel's failure to object to evidence about existence of a drug in murder defendant's system where only killer's identity was in dispute). The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Terry*, 529 U.S. at 404-08.

    3.    State Court Opinion

On direct appeal, Petitioner argued that the evidence was insufficient to support the verdict of first degree murder because the evidence did not show premeditation and deliberation, and that the conviction should be reduced to second degree murder. The state appellate court rejected his claim, stating:

Here, the trial court found that "this killing was deliberate [and] premeditated.  The defendant's comments before and after illustrate this consideration or his consideration of the question of killing the victim.  He told Harun and Mr. Russell that he had to do something to the girl.  That he would [take care] of it, and he'd be back in a minute.  Within seconds of making that very statement he walked directly to the car and fired upon the victim.  Moments after the shooting he explained that he had to 'slap that bitch.'  He had to 'pop that bitch.'  Therefore, I find that the defendant is guilty beyond a reasonable doubt of first degree premeditated and deliberate murder."

Defendant makes much of the fact that many of the circumstances of the killing could not have been anticipated: "Had Holloway never seen [defendant] walking on the street, had Holloway's friend welcomed [defendant] into her home, had Tensley decided not to wait in the small white car, had the SUV not been [there] to retrieve a barbecue, had [Harun and Russell] not been driving along Peppermill at the very moment [defendant] left the small white car[,] . . . the tragic outcome of that day" would not have occurred.  Nonetheless, there was ample evidence to support an inference of planning.  Although there was no evidence that defendant planned the murder days or even hours before the shooting, he told his friends that Holloway was "talkin' about his mama," declined his friend's invitation to "take care of it," then instructed them to wait while he returned to Tensley and Holloway.  While the Supreme Court has "defined 'deliberate' as '"formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action,"'" and "'premeditated' as '"considered beforehand,"' "[']"[p]remeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection.  "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'"  (*People v. Memro* (1995) 11 Cal. 4th 786, 862-863; *People v. Perez*, *supra*, 2 Cal. 4th at p. 1127 ["premeditation can occur in a brief period of time.  'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly'"].)

As for motive, there was ample evidence that defendant and Holloway had an ongoing dispute regarding both the manner in which she wanted to market his music and his apparent desire to present the music of others as his own.  Although killing Holloway over such a disagreement may not have been a rational response, and in fact may be inexplicable, "the law does not require that a first degree murderer have a 'rational' motive for killing.  Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient."  (*People v. Lunafelix* (1985) 168 Cal. App. 3d 97, 102.)  Moreover, the manner of killing -- by shooting Holloway in the neck at close range -- is also evidence to support a finding of deliberation.  (See, e.g., *People v. Bloyd* (1987) 43 Cal. 3d 333, 348 ["The manner of killing . . . was very strong evidence of deliberation and premeditation: The evidence described actions that were cold and calculated-execution-style killings, shots to the head"].)

While the evidence undoubtedly would have supported a finding consistent with defendant's view of the case -- that this was "a killing propelled by an unconsidered and rash impulse rather than the product of reflection and weighing of consequences for and against the act" -- that is not

1    the test on appeal.  "[T]he relevant question on appeal is not whether we are
     convinced beyond a reasonable doubt, but whether any rational trier of fact
2    could have been persuaded beyond a reasonable doubt that defendant
     premeditated the murder."  (*People v. Perez*, *supra*, 2 Cal. 4th at p. 1127.)
3    Reviewing the entire record in the light most favorable to the judgment, as we
     must (*People v. Bolin* (1998) 18 Cal. 4th 297, 331), there is sufficient credible
4    evidence reasonably to support the conclusion that, in firing two shots into
     Holloway's neck at close range, defendant acted with premeditation and
5    deliberation.

6    (Op. at 5-7.)

7            In the instant federal petition, Petitioner has raised an ineffective assistance of counsel

8    claim instead of the aforementioned insufficiency of the evidence claim.  Again, Petitioner

9    claims that his appellate counsel was ineffective for failing to raise any issue pertaining to the

10   trial court's finding of sanity.  This Court assumes that Petitioner is claiming that his appellate

11   counsel should have raised an insufficiency of the evidence claim as to the finding of sanity --

12   similar to his insufficiency of the evidence claim as to the finding of first degree murder on

13   direct appeal.  The Court also assumes that Petitioner claims that in summarily denying his

14   claim, the state courts unreasonably applied clearly established federal law in rejecting his

15   contention of ineffective assistance of appellate counsel.

16           4.    Analysis

17           To establish his entitlement to relief on the ineffective assistance of counsel claim,

18   Petitioner must show that, had his appellate counsel raised an insufficiency of the evidence claim

19   as to the finding of sanity, then such an argument would have swayed the trial court to find the

20   Petitioner was insane and, thus, there would have been a reasonable probability that the result of

21   the proceedings would have been different.  Respondent argues that Petitioner cannot show

22   prejudice based on trial counsel's failure to make such an argument, stating:

23           Had appellate counsel raised a sufficiency of the evidence argument as
             to the sanity finding, it would not have been meritorious.  Petitioner could not
24           have prevailed on appeal unless the evidence of insanity was so overwhelming
             that the trier of fact could not have rejected it.  *People v. Drew*, 22 Cal.3d at
25           351.[4]

26

27   _____

28       [4] *People v. Drew*, 22 Cal. 3d 333, 351 (1978), *superseded by statute on other grounds as stated in People v. Wilder*, 33 Cal. App. 4th 90, 99 (1995).

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd          10

Dr. Good concluded that petitioner was sane. Dr. Blinder's opinion was that petitioner approached the statutory level for insanity, but that he could not prove that the mental problems reached that level although it was possible that they reached that level. Dr. Good's opinion was substantial evidence that petitioner was sane and it was essentially unrebutted by Dr. Blinder's opinion. The only reasonable conclusion the Court of Appeal would have reached had appellate counsel argued that the evidence of sanity was insufficient, is that the evidence was sufficient to support the finding. There was certainly no reasonable probability it would have ruled in petitioner's favor on this issue. In fact, by denying the habeas corpus petition the Court of Appeal implicitly determined that the evidence of sanity was sufficient to uphold the finding of sanity.

(Answer at 7-8 (footnote added).)

This Court agrees with Respondent. The record shows that there was sufficient evidence presented to the trial court to support its finding that Petitioner was sane. A psychiatrist and a forensic psychologist both testified as to this issue. The forensic psychologist concluded that Petitioner was sane when he committed the murder. Meanwhile, the psychiatrist testified that while it was possible that Petitioner's condition may have "approached" the threshold for legal insanity, he "cannot prove that it reached or exceeded that -- that threshold." RT 490. By denying habeas relief the state courts implicitly found that there was no prejudice from the alleged ineffective assistance of appellate counsel, because there was no reasonable probability of a more favorable result had Petitioner raised the issue on appeal. *See, e.g., Morrison v. Estelle,* 981 F.2d 425, 429 (9th Cir. 1992) *cert. denied,* 508 U.S. 920 (1993) (The failure to undertake a futile action does not constitute ineffective assistance of counsel.); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (same). In addition, by denying the habeas relief the state courts also implicitly found that there was no deviation from professional norms because the issue appellate counsel failed to raise with respect to the sanity finding was weaker than the issue counsel actually raised on direct appeal in connection with the finding of first degree murder. In either case, the denial of the petition did not involve an unreasonable application of clearly established federal law as set forth in *Strickland*. Therefore, Petitioner cannot show a reasonable probability of a more favorable result, thus, there was no prejudice. *See Strickland*, 466 U.S. at 694.

In sum, Petitioner has fallen far short of establishing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

1   Amendment." *Id.* at 687.  Likewise, Petitioner has not shown that the state courts' rejection of

2   his claim was objectively unreasonable.  *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002);

3   *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

4            Accordingly, Petitioner is not entitled to habeas relief on this claim.

5                                         **CONCLUSION**

6            For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

7            The federal rules governing habeas cases brought by state prisoners require a district

8   court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its

9   ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  Petitioner has

10  not shown "that jurists of reason would find it debatable whether the petition states a valid claim

11  of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

12  Accordingly, a COA is DENIED.

13           The Clerk of the Court shall enter judgment in favor of Respondent and close the file.

14           The Court also directs the Clerk to substitute Warden Mike McDonald as the Respondent

15  in this action.  (*See supra* note 2.)

16           Finally, Petitioner is entitled to a refund for the second $5.00 filing fee paid in this action.

17  (*See supra* note 1.)  The Court's Financial Office is directed to refund the second $5.00 filing fee

18  in this action, Case No. C 09-5849 LHK (PR) (paid 2/01/2010, receipt #34611041766) and to

19  forward a copy of the refund statement to the Clerk for docketing along with a copy of this order.

20           IT IS SO ORDERED.

21  DATED: ___12/2/11_____          *Lucy H. Koh*

22                                         LUCY H. KOH
                                           United States District Judge

23

24

25

26

27

28

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing
Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd          12