IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTON-MICHAEL TYLER POTTS,<br><br>    Petitioner,<br><br>  v.<br><br>MIKE McDONALD, Warden,<br><br>    Respondent. | No. C 09-5849 LHK (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; REFUNDING SECOND FILING FEE; AND INSTRUCTIONS TO CLERK |

    Petitioner, who is also known as "Knyva," is a state prisoner proceeding *pro se*. He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He paid the filing fee.[1]

    The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition.[2] Petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that

---

[1] The record shows that Petitioner has paid the $5.00 filing fee twice. See Receipt # 34611041226 (Docket no. 6), Receipt # 34611041766 (Docket no. 10). Therefore, he is entitled to a refund for the second $5.00 filing fee paid in this action, as directed below.

[2] Petitioner named James Walker, former warden of California State Prison - Sacramento in Folsom, California, as the Respondent in this action. Mike McDonald, the current warden of High Desert State Prison in Susanville, California -- where Petitioner is currently incarcerated -- has been substituted as Respondent in place of Petitioner's prior custodian pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1  Petitioner is not entitled to relief based on the claim presented and denies the petition.

2  **PROCEDURAL HISTORY**

3  The Contra Costa County district attorney filed an information charging Petitioner with
4  first degree murder of Shani Holloway. The district attorney also alleged that Petitioner
5  personally discharged a firearm causing death. Petitioner pled not guilty and not guilty by
6  reason of insanity.

7  On December 8, 2006, Petitioner's nonjury trial began. CT 382. On December 18, 2006,
8  the trial court found Petitioner guilty of first degree murder. The trial court also found all three
9  of the firearm enhancements to be true, and that Petitioner was sane at the time of the crime. CT
10 405.

11 On January 12, 2007, the trial court sentenced Petitioner to a term of twenty-five years to
12 life in state prison for the first degree murder. The court also imposed a consecutive term of
13 twenty-five years to life for the enhancement of personally discharging a firearm proximately
14 causing death. Petitioner was also sentenced to ten-and twenty-year terms for the other two
15 firearm enhancements, which were stayed. Thus, Petitioner's total term was fifty years to life.
16 CT 431.

17 Petitioner timely appealed. On April 22, 2008, the California Court of Appeal affirmed
18 the conviction. On July 9, 2008, the California Supreme Court denied review.

19 Thereafter, Petitioner filed a petition for a writ of habeas corpus in the state superior
20 court, raising the same claim as in the present federal petition. On March 4, 2009, the state
21 superior court denied the petition stating that it had "no jurisdiction to grant the relief requested"
22 because it believed the "Court of Appeal is the correct forum . . . ." (Resp. Exh. I, Attach.)

23 On June 16, 2009, Petitioner filed a petition for a writ of habeas corpus in the state
24 appellate court. On June 18, 2009, that court summarily denied his petition. (*Id.*)

25 On June 25, 2009, Petitioner filed a petition for a writ of habeas corpus in the state
26 supreme court. On November 10, 2009, that court also issued a summary denial of his petition.
27 (Resp. Ex. J.)

28

Petitioner commenced this federal action on December 15, 2009.

## BACKGROUND[3]

Justin Tensley testified that he and Holloway first met defendant, who was well known in the underground rap community, four or five months before Holloway was killed. The three entered into a business relationship which "started off pretty intact on [a] business level. Then it started getting kind of rocky." Holloway and Tensley met with defendant and a man named "Chief," whom Tensley described as possibly defendant's manager, approximately one month before Holloway was killed. The meeting "started off pretty intact, you know, business ethics [and] all that. But once we started getting around to the paperwork it was like [defendant and Chief] were just trying . . . to get us to promote some songs that were previously on somebody else's album. So we were . . . trying to tell these guys if you want this song on this CD you have to get this gentleman to, you know, give you permission and when they're saying they gave us permission, his word, verbal agreement." Tensley did not accept defendant's representation that he had permission to use a particular song. There were constant disagreements regarding defendant's desire to use other people's music without permission. "Any time we tried to discuss promoting music . . . that always came up." Nevertheless, Tensley also testified that relations with defendant were friendly.

On the afternoon of June 6, 2004, Holloway and Tensley had plans to meet defendant at their home in Hercules, but defendant did not appear. Later that day, as Tensley and Holloway were driving to a friend's house to watch a basketball game, they saw defendant. Holloway "flagged him down, asked him where he was going. And he said he was going to El Pueblo, and that . . . he needed a ride." Holloway suggested that defendant join them at their friend's house but Tensley said, "that's not our house, and we don't know if they'll let him come up." The three drove to the friend's house, and when they arrived defendant remained in the car while Tensley and Holloway asked if defendant could join them. The friend declined to invite defendant in, and Holloway and Tensley returned to the car and asked defendant if they could drive him anywhere.

Defendant asked to be taken to an apartment complex called Peppermill in Pittsburg. Once there, defendant directed Tensley where to park and the three began discussing business. Tensley and Holloway "were talking about being on the radio, making his music for the radio." Defendant "wasn't too happy about that. He said that he didn't want to be on the radio." Tensley and Holloway were not "happy to hear that. . . . [T]hat doesn't make no sense. If you want to make music and make a lot of money, how are you going to do it and not be on the radio?" They told defendant they did not understand his concern, but defendant maintained that he did not want his music presented in a manner associated with mainstream music. Defendant got out of the car, saying, "'Fuck the radio. The radio is not shit. I'm not trying to do that, and I'll be right back.'" When he got out of the car, he "[h]ad a phone on his lap. The phone hit the ground, shattered everywhere. He

---

[3] The facts of this case are taken from the California Court of Appeal opinion in *People v. Potts*, No. A116692, 2008 WL 1801578 (Cal. App. 1 Dist. Apr. 22, 2008). (Resp. Ex. F ("Op.")).

>picked up all the phone piece[s]. He didn't even put the phone back together. Put it in the pocket, and he went over to" an SUV that was parked nearby. Tensley and Holloway remained in the car discussing the issue of radio promotion. As they talked, the SUV pulled closer to them. Defendant was walking next to the SUV and speaking to the driver. Then "he walks up on the passenger side [of Tensley's car], and he didn't say a word or anything like that and extended his arm, out and that was it -- pow. Pow. [¶] . . . [¶] After he shot her I seen him. And she falls over to her side. And then I'm looking at him while he has his arm extended out, and after we looked at each other [in] the eyes -- he darts off. He jumps in the SUV. They pull off." Tensley took Holloway to the hospital, where she died that evening.
>
>Michael Russell testified that on the day Holloway was shot, he was in an SUV being driven by his girlfriend, Harun. They saw defendant at the apartment complex "in the middle of [the] street flagging us down." Russell and Harun told defendant "to get in. We were having a barbecue. And he told her that somebody was talkin' about his mama. And she said did he want me to take care of it. He said, 'no.' We asked him did he have some money for some meat. He said, 'Hold on a minute. I'll be right back.'" He then walked to another car, then "walked back to the car and said, 'let's go.'" Defendant was "normal" when he returned to the SUV. He got in the back seat and "told us to drive off. Then he said he had to slap that bitch." Harun asked what he meant, and defendant replied, "I had to pop that bitch." Russell began screaming, "Get him out of the car," and they dropped off defendant.

(Op. at 1-3.)

## DISCUSSION

A.   <u>Standard of Review</u>

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on

factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Terry*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.  The Court must presume correct any determination of a factual issue made by a state court unless Petitioner rebuts the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

The last reasoned opinion of the state courts discussing Petitioner's claim was that of the state superior court which found that it did not have jurisdiction to consider the matter because, as mentioned above, it believed that the state appellate court was the correct forum.  (Resp. Exh. I, Attach.)  Although a federal court will normally "look through" a silent denial to the last reasoned decision of the state courts, *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), the presumption that subsequent unexplained decisions rest on the same basis as the explained

1 decision is rebuttable. *Id.* at 804-05. Because the subsequent decisions of the state appellate and

2 supreme courts could not reasonably have been based on the theory that Petitioner pursued his

3 remedy in the wrong forum, the Court will assume that the presumption that the unexplained

4 decisions reflect the same reasoning as the explained decision has been rebutted, and that the

5 state appellate and supreme courts denied the respective petitions on the merits.

6 B.      Petitioner's Claim

7        1.      Factual Background

8        Petitioner raises the following claim in his federal habeas petition: that his appellate

9 counsel, who argued on direct appeal that the evidence did not support the verdict of first degree

10 murder, rendered ineffective assistance by failing to raise an issue pertaining to the trial court's

11 finding that Petitioner had not sustained his burden with respect to the insanity defense.

12        As explained above, Petitioner pleaded not guilty and not guilty by reason of insanity.

13 The record shows that Petitioner agreed to allow the trial court to hear evidence on the sanity

14 issue before ruling on the guilt phase issues. RT 468-469. There is no other state court opinion

15 which summarizes the facts underlying Petitioner's ineffective assistance of counsel claim.

16 Respondent has summarized the background facts relating to the ineffective assistance of claim

17 in his memorandum of points and authorities in support of the answer. There is nothing in the

18 record that indicates that Petitioner disputes the underlying course of events. The Court has

19 reviewed the facts and agrees with Respondent's interpretation. Accordingly, the Court includes

20 here Respondent's summary of the facts relevant to Petitioner's ineffective assistance of counsel

21 claim as well as the facts with respect to the sanity issue:

> Dr. Martin Blinder, a psychiatrist, who was appointed by the court to examine petitioner in connection with the issue of sanity, met with petitioner for less than an hour on April 2, 2006. RT 492, 494. Based on his interview, his review of various records, including records showing that petitioner had harmed himself while in custody, Dr. Blinder concluded that petitioner suffered from probable drug induced paranoid psychosis, with mild residual cerebral organicity secondary to his years of polysubstance abuse. The substances that were abused were primarily alcohol, marijuana, ecstasy and cocaine. RT 488.
>
> Dr. Blinder stated that paranoid people misjudge situations and see a neutral situation as threatening and hostile. RT 488-89. He based his opinion

on the fact that jail records showed that petitioner was psychotic while he was in custody, that the crime had a paranoid component to it, that petitioner had used marijuana, and marijuana can make a person paranoid. RT 498-500.

Dr. Blinder thought that petitioner misperceived the situation that resulted in the shooting and that as a result of the misperception petitioner might not have appreciate the wrongfulness of his acts. RT 489. He thought it possible that petitioner's condition met the threshold for legal insanity, but admitted that he could not prove that it reached or exceeded that level. RT 490.

Dr. Blinder had not reviewed the police reports of the incident, and had not read petitioner's lyrics. RT 496, 506. He did not know about the disagreement between Holloway and petitioner as to the way petitioner's music would be marketed. RT 503.

Paul Good, a forensic psychologist who was appointed to assess petitioner's condition[,] RT 525-527, stated that petitioner reported that on the day before the murder, a voice inside him had asked if he wanted to feel what it was like to be shot in the head. RT 529. Petitioner told Dr. Good that he was angry at and disappointed with the victim, but that he was unable to remember much about the shooting. RT 528-531.

Dr. Good noted that the jail records did not show that petitioner had any signs of mental disorder until October 2, 2004. RT 531. Petitioner gave him a history of having used four to six marijuana blunts a day since adolescence. Petitioner also told him he was drinking eight ounces of liquor every few days, as well as a few beers, and that he was using ecstasy on a regular basis as well as cocaine. RT 531.

Petitioner said that his substance abuse and criminal conduct occurred in the wake of his mother's death when he was 12. RT 531. Petitioner claimed to have had auditory hallucinations at times, but Dr. Good did not see evidence of current hallucinations. RT 534. He believed petitioner's mental faculties were within normal limits. RT 534.

A test that measured malingering showed that petitioner over-reported symptoms on four of five different scales. RT 535. Dr. Good thought petitioner was sane when he committed the murder. RT 536. The basis for his opinion was that petitioner's behavior was organized and purposeful. The fact that petitioner decided to leave the scene showed that he understood he had done something wrong. RT 536-37. Petitioner also said right afterwards, "I popped her". This showed that he knew he had shot the victim. RT 537. According to Dr. Good, the fact that petitioner attempted to flee at the police station and that when the police called his cell phone, he said that no one was there by the name the police asked for, showed that he understood he had done something wrong. RT 538-540.

The court, sitting as the trier of fact, found that petitioner was sane. RT 602.

(Answer at 5-6.)

    2.    <u>Applicable Federal Law</u>

1    A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth
2 Amendment right to counsel, which guarantees not only assistance, but effective assistance of
3 counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth
4 Amendment ineffectiveness of counsel claim, a petitioner must establish two things.  First, he
5 must establish that counsel's performance was deficient, i.e., that it fell below an "objective
6 standard of reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Second, he
7 must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a
8 reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding
9 would have been different."  *Id.* at 694.  A reasonable probability is a probability sufficient to
10 undermine confidence in the outcome.  *Id.*

11    A court need not determine whether counsel's performance was deficient before
12 examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  *See*
13 *id.* at 697.  Where the defendant is challenging his conviction, the appropriate question is
14 "'whether there is a reasonable probability that, absent the errors, the factfinder would have had a
15 reasonable doubt respecting guilt.'"  *Luna v. Cambra*, 306 F.3d 954, 961 (9th Cir.), *amended*, 311
16 F.3d 928 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695); *see, e.g.*, *Plascencia v. Alameida*,
17 457 F.3d 1190, 1201 (9th Cir. 2006) (ineffective assistance of counsel claim not established
18 because "any prejudicial effect was at best minute" from counsel's failure to object to evidence
19 about existence of a drug in murder defendant's system where only killer's identity was in
20 dispute).  The *Strickland* framework for analyzing ineffective assistance of counsel claims is
21 considered to be "clearly established Federal law, as determined by the Supreme Court of the
22 United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Terry*, 529 U.S. at 404-08.

23    3.   State Court Opinion

24    On direct appeal, Petitioner argued that the evidence was insufficient to support the
25 verdict of first degree murder because the evidence did not show premeditation and deliberation,
26 and that the conviction should be reduced to second degree murder.  The state appellate court
27 rejected his claim, stating:

28

Here, the trial court found that "this killing was deliberate [and] premeditated. The defendant's comments before and after illustrate this consideration or his consideration of the question of killing the victim. He told Harun and Mr. Russell that he had to do something to the girl. That he would [take care] of it, and he'd be back in a minute. Within seconds of making that very statement he walked directly to the car and fired upon the victim. Moments after the shooting he explained that he had to 'slap that bitch.' He had to 'pop that bitch.' Therefore, I find that the defendant is guilty beyond a reasonable doubt of first degree premeditated and deliberate murder."

Defendant makes much of the fact that many of the circumstances of the killing could not have been anticipated: "Had Holloway never seen [defendant] walking on the street, had Holloway's friend welcomed [defendant] into her home, had Tensley decided not to wait in the small white car, had the SUV not been [there] to retrieve a barbecue, had [Harun and Russell] not been driving along Peppermill at the very moment [defendant] left the small white car[,] . . . the tragic outcome of that day" would not have occurred. Nonetheless, there was ample evidence to support an inference of planning. Although there was no evidence that defendant planned the murder days or even hours before the shooting, he told his friends that Holloway was "talkin' about his mama," declined his friend's invitation to "take care of it," then instructed them to wait while he returned to Tensley and Holloway. While the Supreme Court has "defined 'deliberate' as '"formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action,"'" and "'premeditated' as '"considered beforehand,"' "[']"[p]remeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'" (*People v. Memro* (1995) 11 Cal. 4th 786, 862-863; *People v. Perez*, *supra*, 2 Cal. 4th at p. 1127 ["premeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly'"].)

As for motive, there was ample evidence that defendant and Holloway had an ongoing dispute regarding both the manner in which she wanted to market his music and his apparent desire to present the music of others as his own. Although killing Holloway over such a disagreement may not have been a rational response, and in fact may be inexplicable, "the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient." (*People v. Lunafelix* (1985) 168 Cal. App. 3d 97, 102.) Moreover, the manner of killing -- by shooting Holloway in the neck at close range -- is also evidence to support a finding of deliberation. (See, e.g., *People v. Bloyd* (1987) 43 Cal. 3d 333, 348 ["The manner of killing . . . was very strong evidence of deliberation and premeditation: The evidence described actions that were cold and calculated-execution-style killings, shots to the head"].)

While the evidence undoubtedly would have supported a finding consistent with defendant's view of the case -- that this was "a killing propelled by an unconsidered and rash impulse rather than the product of reflection and weighing of consequences for and against the act" -- that is not

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd        9

>    the test on appeal. "[T]he relevant question on appeal is not whether we are convinced beyond a reasonable doubt, but whether any rational trier of fact could have been persuaded beyond a reasonable doubt that defendant premeditated the murder." (*People v. Perez*, *supra*, 2 Cal. 4th at p. 1127.) Reviewing the entire record in the light most favorable to the judgment, as we must (*People v. Bolin* (1998) 18 Cal. 4th 297, 331), there is sufficient credible evidence reasonably to support the conclusion that, in firing two shots into Holloway's neck at close range, defendant acted with premeditation and deliberation.

(Op. at 5-7.)

In the instant federal petition, Petitioner has raised an ineffective assistance of counsel claim instead of the aforementioned insufficiency of the evidence claim. Again, Petitioner claims that his appellate counsel was ineffective for failing to raise any issue pertaining to the trial court's finding of sanity. This Court assumes that Petitioner is claiming that his appellate counsel should have raised an insufficiency of the evidence claim as to the finding of sanity -- similar to his insufficiency of the evidence claim as to the finding of first degree murder on direct appeal. The Court also assumes that Petitioner claims that in summarily denying his claim, the state courts unreasonably applied clearly established federal law in rejecting his contention of ineffective assistance of appellate counsel.

4.  <u>Analysis</u>

To establish his entitlement to relief on the ineffective assistance of counsel claim, Petitioner must show that, had his appellate counsel raised an insufficiency of the evidence claim as to the finding of sanity, then such an argument would have swayed the trial court to find the Petitioner was insane and, thus, there would have been a reasonable probability that the result of the proceedings would have been different. Respondent argues that Petitioner cannot show prejudice based on trial counsel's failure to make such an argument, stating:

>    Had appellate counsel raised a sufficiency of the evidence argument as to the sanity finding, it would not have been meritorious. Petitioner could not have prevailed on appeal unless the evidence of insanity was so overwhelming that the trier of fact could not have rejected it. *People v. Drew*, 22 Cal.3d at 351.[4]

---

[4] *People v. Drew*, 22 Cal. 3d 333, 351 (1978), *superseded by statute on other grounds as stated in People v. Wilder*, 33 Cal. App. 4th 90, 99 (1995).

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability; Refunding Second Filing Fee; and Instructions to Clerk
P:\PRO-SE\SJ.LHK\HC.09\Potts849hcden.wpd            10

> Dr. Good concluded that petitioner was sane. Dr. Blinder's opinion was that petitioner approached the statutory level for insanity, but that he could not prove that the mental problems reached that level although it was possible that they reached that level. Dr. Good's opinion was substantial evidence that petitioner was sane and it was essentially unrebutted by Dr. Blinder's opinion. The only reasonable conclusion the Court of Appeal would have reached had appellate counsel argued that the evidence of sanity was insufficient, is that the evidence was sufficient to support the finding. There was certainly no reasonable probability it would have ruled in petitioner's favor on this issue. In fact, by denying the habeas corpus petition the Court of Appeal implicitly determined that the evidence of sanity was sufficient to uphold the finding of sanity.

(Answer at 7-8 (footnote added).)

This Court agrees with Respondent. The record shows that there was sufficient evidence presented to the trial court to support its finding that Petitioner was sane. A psychiatrist and a forensic psychologist both testified as to this issue. The forensic psychologist concluded that Petitioner was sane when he committed the murder. Meanwhile, the psychiatrist testified that while it was possible that Petitioner's condition may have "approached" the threshold for legal insanity, he "cannot prove that it reached or exceeded that -- that threshold." RT 490. By denying habeas relief the state courts implicitly found that there was no prejudice from the alleged ineffective assistance of appellate counsel, because there was no reasonable probability of a more favorable result had Petitioner raised the issue on appeal. *See, e.g., Morrison v. Estelle,* 981 F.2d 425, 429 (9th Cir. 1992) *cert. denied,* 508 U.S. 920 (1993) (The failure to undertake a futile action does not constitute ineffective assistance of counsel.); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (same). In addition, by denying the habeas relief the state courts also implicitly found that there was no deviation from professional norms because the issue appellate counsel failed to raise with respect to the sanity finding was weaker than the issue counsel actually raised on direct appeal in connection with the finding of first degree murder. In either case, the denial of the petition did not involve an unreasonable application of clearly established federal law as set forth in *Strickland*. Therefore, Petitioner cannot show a reasonable probability of a more favorable result, thus, there was no prejudice. *See Strickland*, 466 U.S. at 694.

In sum, Petitioner has fallen far short of establishing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

1 Amendment." *Id.* at 687. Likewise, Petitioner has not shown that the state courts' rejection of
2 his claim was objectively unreasonable. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002);
3 *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

Accordingly, Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk of the Court shall enter judgment in favor of Respondent and close the file.

The Court also directs the Clerk to substitute Warden Mike McDonald as the Respondent in this action. (*See supra* note 2.)

Finally, Petitioner is entitled to a refund for the second $5.00 filing fee paid in this action. (*See supra* note 1.) The Court's Financial Office is directed to refund the second $5.00 filing fee in this action, Case No. C 09-5849 LHK (PR) (paid 2/01/2010, receipt #34611041766) and to forward a copy of the refund statement to the Clerk for docketing along with a copy of this order.

IT IS SO ORDERED.

DATED: 12/2/11

*Lucy H. Koh*
LUCY H. KOH
United States District Judge